UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THE AYCO COMPANY, L.P.,

                          Plaintiff,

        -against-                                   1:10-CV-1213 (GLS/DRH)

BRIAN D. FELDMAN,

                          Defendant.
_____

## DECISION and ORDER

## I.    INTRODUCTION

        On October 12, 2010, the Ayco Company, L.P. ("Plaintiff" or "Ayco") initiated the instant

action by filing a Complaint against Brian D. Feldman ("Defendant" or "Feldman").  Dkt. No. 1.

Plaintiff alleges that Defendant breached the terms of his employment contract, misappropriated

confidential information and trade secrets, breached fiduciary duties owed to Plaintiff, and engaged

in unfair competition.  Id.  Plaintiff seeks damages and injunctive relief, pursuant to Federal Rule of

Civil Procedure 65.  Id.; Pl.'s Mot. for a temporary restraining order and preliminary injunction

(Dkt. No. 4) ("PI Motion").[1]

        On October 14, 2010, this Court granted Plaintiff's request for a temporary restraining order

("TRO") enforcing a ninety-day non-compete agreement entered into by the parties; enjoining

Defendant from using or divulging Plaintiff's confidential information and trade secrets; and

requiring the immediate return of any such material in Defendant's possession.  Dkt. No. 8.  The

Court has received additional submissions and held a Show Cause hearing on October 21, 2010 to

_____

        [1] This action is assigned to the Honorable Gary L. Sharpe.  The undersigned is handling the
matter for the limited purpose of adjudicating the instant Motion.  Dkt. No. 5.

determine whether a preliminary injunction enjoining the same conduct covered by the TRO

through December 23, 2010 is warranted.  Id.   Upon consideration of the submissions, oral

arguments, and applicable law, the Court grants Plaintiff's request for preliminary injunctive relief.

## II.    BACKGROUND

Ayco is a financial services company that provides comprehensive financial counseling and

education services for corporate executives and employees and wealthy individuals.  Cavoli Decl.

(Dkt. No. 16-1) ¶ 8; Roe Aff. (Dkt. No. 4-3) ¶ 5.  Ayco provides a broad range of services including

tax and estate planning, wealth transfer, insurance planning, investment management, benefits and

compensation strategies, and retirement planning.  Roe Aff. ¶ 6.  It has been operating for

approximately 40 years, during which time it has achieved an extensive client base largely by

developing relationships with corporations and entering into contracts to provide financial services

to the senior executives of those corporations, as part of their compensation package.  Id. ¶ 5. Ayco

continues to service a number of these executives after they retire.  Id.  Ayco's client list is not

publicly available.  Id. ¶ 26; Cavoli Decl. (Dkt. No. 24-1) ¶¶ 7-9..

Ayco is registered with the Securities and Exchange Commission, but it is not a broker

dealer and is not registered with the Financial Industry Regulatory Authority ("FINRA").  Cavoli

Decl.¶¶ 9, 16; 10/21/2010 OSC Tr. ("OSC Tr.") 16:1-2.  Its affiliates include other investment

advisors, insurance agencies, real estate brokerages, securities broker-dealers, commodities and

future advisors, and banks.  Id.  One affiliate, Mercer, is a broker-dealer primarily involved with the

sale of variable life insurance and variable annuities; Mercer's "authority to do business is based on

its own independent license with FINRA."  Id. ¶¶ 14,17.  Both Ayco and Mercer are wholly owned

subsidiaries of The Goldman Sachs Group, Inc.  Ayco is the sole limited partner of Mercer;

Mercer's general partner, GS Ayco Holding LLC is the sole limited partner of Ayco.  Id. ¶ 13.

On September 1, 2005, Ayco hired Defendant to work as a financial analyst in its Dallas, Texas office.  Roe Aff. (Dkt. No. 4-3) ¶¶ 5-9.  As a condition of employment, Ayco required Feldman to become licensed as a registered representative of FINRA.  Feldman Aff. (Dkt. No. 11-2) ¶ 9.  Feldman, a then-recent law school graduate, had no prior experience as a financial analyst and brought no new clients to Ayco upon joining the company.[2]  Ayco provided Feldman with training, and over the years, he serviced many clients for Ayco.  Many of these were Ayco clients prior to Feldman's joining the company.  Others, Feldman solicited and cultivated for Ayco during his employ.  All but one, however, came directly from Ayco or from a corporation that Ayco assigned him to service.  At the time of his departure, Feldman was acting as an Account Manager and serviced seventy-seven Ayco clients.  Roe Aff. ¶¶ 10-12; OSC Tr. at 22:19-21.  According to Feldman, many of the existing clients were ready to leave Ayco before he took over their accounts; many of the new clients were attracted to Ayco only because of his efforts, and he received little help from Ayco in recruiting them.  Feldman Decl. ¶ 31-32, 36.

Upon being hired, Feldman signed an Employee Agreement Regarding Confidential and Proprietary Information and Materials.  That agreement was revised in 2010 to include a new non-compete provision; a reduced non-solicitation period following termination (from two years to six months);[3] an altered compensation scheme for account managers; and a grant to account managers

---

[2] Ayco's business practice is to deliberately recruit people with little experience in the financial industry and train them in its own practices.  Roe Aff. ¶ 23.

[3] See Agreement § II.A.3 (prohibiting employee for six months after his or her termination from "soliciting" any Ayco client to whom the employee rendered "Services" on behalf of Ayco during the prior twenty-four months or any prospective client whom the employee solicited on behalf of Ayco during the prior twelve months).

3

of access to certain confidential information.  Cavoli Decl. (Dkt. No 24) ¶ 10.  On July 1, 2010,

Feldman signed the revised agreement ("Agreement").  Dkt. No. 1, Ex. A.  Under the Agreement,

Ayco stipulated that it would provide Feldman with resources for acquiring, soliciting, and servicing

clients, and "establishing and developing goodwill with Ayco's Clients and Prospective Clients on

behalf of Ayco."  Id. § II.A.1.  The Agreement's "Goodwill" clause continues,

> In consideration for Ayco's promise, specified in § II.A.1. above, the Employee agrees to use
> the resources provided by Ayco solely to acquire Clients, solicit Prospective Clients, build
> relationships and goodwill with Ayco's Clients and Prospective Clients solely on behalf of
> Ayco . . . .  Employee further agrees not to misappropriate or otherwise use Ayco's goodwill
> with its Clients for the benefit of any entity or individual other than Ayco . . . .

Id. § II.A.2.

The Agreement required Feldman to acknowledge that, in connection with his employment,

Ayco will provide him with

> certain valuable and confidential information and trade secrets, created and developed at
> Ayco's expense and not generally known within the financial services industry, which
> information includes, but is not limited to, information regarding the identity, assets,
> financial needs and preferences of Clients and Prospective Clients, information regarding
> the financial affairs, personnel matters, products, and operating procedures, of Ayco, its
> employees, its Clients and certain third parties . . . and numerous forms, documents, written
> materials and computer programs created and developed by Ayco for the purpose of
> rendering Services to its Clients and Prospective Clients, and the proprietary methods,
> formulas, plans and other work product which they represent.

Id. § II.B.1.  By signing, Feldman agreed to "maintain the confidentiality of all Ayco Proprietary

Information that he has received;" use such proprietary information solely for purposes authorized

by Ayco; and, upon his termination, immediately return all of Ayco's property to the company.  Id.

Under the Agreement's Termination clause, Feldman agreed that he would give Ayco ninety

days notice of termination, during which time he would remain an Ayco employee and continue to

receive his base salary or salary draw, but would no longer participate in its compensation plan.  Id.

4

§ II.D.  The clause contains a non-compete provision which reads,

> In the event the Employee terminates employment before the expiration of the Notice of Termination Period or terminates employment without giving notice, employee covenants that for the balance of the Notice of Termination Period or, if no notice is given, ninety (90) days . . . the Employee will not associate (including but not limited to association as an individual, sole proprietor, officer, employee, partner, director, consultant, agent or advisor) with any Competitive Enterprise in the United States where, in connection with such association, Employee is engaged in providing [financial counseling, brokerage, estate, tax and insurance planning and/or asset management services], and the period of the restrictions provided for in paragraph 11.A.3 above shall be increased, if no notice is given, by ninety (90) days. . . or the unfulfilled balance of the Notice of Termination Period if notice has been given.

Id. § II.D.

Finally, the Agreement provides that,

> Employee further acknowledges that the restrictions contained herein are reasonable and necessary to protect the legitimate interests of Ayco and do not impose any greater restraint than is reasonably necessary to protect the confidential information, goodwill, training, and other business interests of Ayco and that the enforcement by Ayco of the provisions contained herein, will cause no undue hardship on the Employee. Employee further acknowledges that in the event of a breach of the provisions of this Agreement, Ayco will not have an adequate remedy at law.  Employee therefore agrees that Ayco shall be entitled to temporary, preliminary, and permanent injunctive relief for any violation of Sections II A, B, C and D.

Id. § II.E.2.

On July 9, 2010, Feldman signed an additional Trade Secrets, Confidentiality and Company Property Agreement ("TSA").  Dkt. No. 1, Ex. B.  The TSA reiterates the importance of Ayco's relationship with its clients, and it expressly states that by virtue of an employee's employment with Ayco, that employee will be entrusted with confidential and proprietary business and financial information belonging to Ayco and its clients.  Id.  The TSA defines and gives examples of "Trade Secrets" and "Confidential Information" which include,

> client lists (whether prepared by you or others at Ayco, and including client information

contained within performance reviews or compensation documents), information regarding the identity, assets, financial needs and preferences of clients and prospective clients, information regarding the financial affairs, personnel matters, products, and operating procedures of Ayco, its employees, its clients, its parent entities, and other related third parties . . . and numerous forms, documents, written materials and computer programs created and developed by Ayco for the purpose of rendering services to its clients and prospective clients, and the proprietary methods, formulas, plans and other work product.

Id.  The TSA requires a signatory to "agree to use Ayco Proprietary Information solely for the purposes authorized by Ayco . . . [and] further agree not to take, retain, disclose, misappropriate, or otherwise use Ayco Proprietary Information for your personal benefit or for the benefit of any entity or individual other than Ayco . . . ."

Feldman resigned abruptly on September 24, 2010 to begin working for UBS Financial Services ("UBS"), in UBS's Dallas, Texas office.  Dkt. No. 18-1.  Soon thereafter, Feldman received a letter, dated September 29, 2010, signed by an Ayco Senior Human Resources Administrator, acknowledging Feldman's termination pursuant to his letter of immediate resignation and enclosing Feldman's "final paycheck" for hours earned through September 24, 2010 and unused benefit time.  See Dkt. Nos. 18-1, 18-2.

Feldman's alleged breach of the Agreement and TSA forms the basis of this action.  Plaintiff alleges that Defendant has breached the non-compete, goodwill, and confidentiality provisions, and by virtue of his employment at UBS, will inevitably divulge Ayco's confidential and proprietary information.  PI Mot. at 9-19.  Plaintiff further asserts that Feldman "appears to have surreptitiously misappropriated substantial amounts of Ayco client information just before he left.  Feldman accessed and printed information from Ayco's computer system relating to a number of clients in the days and weeks prior to his resignation and surveillance photos show Feldman leaving Ayco's office on the day before his resignation with a suitcase."  Roe Aff. ¶ 3.  Palintiff notes that at least

6

two of Ayco's clients followed Feldman when he moved to UBS.  Id. ¶ 19; OSC Tr. 11:6-10.[4]

Feldman denies printing and taking documents from Ayco to ease his transition to UBS, and states that his accessing clients' information in the days and weeks prior to his resignation was done in the normal course of business working for Ayco.  Feldman Decl. (Dkt. No 17) ¶ 11, 13, 16, 21, 22, 25.  Feldman does admit to having had a client list that he had printed from his own computer containing names, addresses, telephone numbers, and email addresses.  Id. ¶ 27.  While contending that he has a right to this information, pursuant to the TRO, he entrusted to his attorney the hard copy of that list, other documents related to the commissions he earned and which contain client information, an Ayco mutual fund list, training manual, and a business card with a client's contact information; Feldman's attorney subsequently provided these materials to Ayco.  Id.; LaGalante Decl. (Dkt. No. 20).  With regard to Ayco clients moving to UBS, Feldman attributes their choice to his own performance, not to Ayco's service.  Feldman Decl (Dkt. No. 17) ¶¶ 32-33.

Feldman additionally claims that the agreements upon which Ayco relies were presented to him on a "take it or leave it basis," that if he did not sign them, he would be fired.  Id. ¶¶ 40-43.  He characterizes them as "onerous" and "unfair" because they deny his ability to pursue his chosen profession and do not provide for adequate compensation during the Notice period.  Id. ¶¶ 44-45.

Approximately two weeks after Feldman resigned, on October 12, 2010, Plaintiff filed a Complaint and a Motion for a temporary restraining order and preliminary injunction.  Dkt. Nos. 1, 4.  The latter Motion, the TRO aspect of which was granted on October 14, 2010, see Dkt. No. 8, seeks preliminary injunctive relief enjoining Defendant from: 1) associating with an Ayco

---

[4] At least two other clients have alerted Ayco that they are considering moving to UBS. OSC Tr. 11:6-10.

competitor, where such association involves Defendant's providing financial counseling, brokerage, estate, tax and insurance planning and/or asset management services during a period of not less than ninety days from September 24, 2010; 2) copying, reproducing, giving, divulging, revealing, or otherwise disclosing any form, document, written material, or computer program, or any method, formula, or plan created, developed, or utilized by Defendant, as an employee of Ayco, or by Ayco; and 3) copying, reproducing, giving, divulging, revealing, or otherwise disclosing any confidential business information of Ayco or any client of Ayco and requiring that Defendant return all copies of Ayco's confidential business information.  Dkt. No. 4.

In compliance with this Court's October 14, 2010 temporary restraining order, Defendant has ceased working for UBS.  Feldman Decl. (Dkt. No. 17) ¶ 6.  He has received no compensation from Ayco since his receipt of the September 29, 2010 letter.  However, in its papers and at oral argument, Plaintiff stipulated it would pay Defendant his base salary for the duration of the Notice period should an injunction issue.  Dkt. No. 16 at 15-16; OSC Tr. 4:2-6.

## III.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., __ U.S. __, __, 129 S. Ct. 365, 376 (2008) (citation omitted).  In this Circuit, a court shall grant a motion for a preliminary injunction only where the party seeking the injunction can show "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." NXIVM Corp. v. Ross Institute, 364 F.3d 471, 476 (2d Cir. 2004); Faiveley Transp. Malmo AB v. Wabtec Corp, 559 F.3d 110, 116 (2d Cir. 2009).  "Such relief . . . is an extraordinary and drastic

8

remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Moore v. Consol. Edison Co. of New York, Inc., 409 F.3d 506, 510-511 (2d Cir. 2005)(quotations and citations omitted).

## IV.    DISCUSSION

### A.  Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley, 559 F.3d at 118 (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001). Irreparable harm is characterized "as certain and imminent harm for which a monetary award does not adequately compensate." Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 113-14 (2d Cir. 2003).  Merely speculative harm is insufficient to establish irreparable harm.  See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37 (2d Cir. 1995).  A movant's failure to establish irreparable harm is alone sufficient for a court to deny injunctive relief.

The instant Motion implicates several potential bases for a finding of irreparable injury. "Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004); RESCUECOM, No. 5:05-CV-1330, 2006 WL 1742073, at *2 (N.D.N.Y. June 20, 2006); Innoviant Pharm., Inc. v. Morganstern, 390 F. Supp. 2d 179, 189 (N.D.N.Y. 2005); Ecolab, Inc. v. Paolo, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991); BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 392 (1999)(an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the

employer's competitive detriment").  Monetary damages are insufficient to compensate such loss, as it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999).  Additionally, "[i]f the unique services of [an] employee are available to a competitor, the employer obviously suffers irreparable harm."  Ticor, 173 F.3d at 69; see Natsource, 151 F. Supp. 2d at 469 (an employer plaintiff will suffer irreparable harm if a defendant employee breaching a 120-day non-compete clause "is allowed to immediately work for a competitor, or otherwise solicit these customers, [as] these customers are likely to follow him because of their unique relationship," thereby depriving the plaintiff of the benefit of its bargain); Kelly v. Evolution Markets, Inc, 626 F. Supp. 2d 364, 376 (S.D.N.Y. 2009); see also Eurobrokers Capital Markets, Inc. v. Flinn, No. 93 Civ. 3785, 1993 WL 213026, at *1 (S.D.N.Y. June 16, 1993).  The loss of an employer's confidential customer information also constitutes irreparable harm.  See, e.g., North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 49 (2d Cir. 1999)(citing FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984)); Wenner Media LLC v. Northern & Shell North Am. Ltd., No. 05 Civ. 1286, 2005 WL 323727, at *3-*4 (S.D.N.Y. Feb. 8, 2005); Eurobrokers, 1993 WL 213026, at *1 (citing Ecolab, 753 F. Supp. at 1110); Euro-Cut, Inc. v. Futersak, 476 F. Supp. 2d 218, 227 (E.D.N.Y. 2007).  Where an employee agrees that breach of the post-employment competition provision will leave an employer without adequate remedy at law and shall entitle it to injunctive relief, that agreement may be suggestive of the irreparable injury the employer suffers in its breach.  Ticor, 173 F.3d at 69; Innoviant, 390 F. Supp. 2d at 189 (confidentiality provision in an agreement stating that serious irreparable harm would flow from its breach buttresses a conclusion of irreparable injury).

10

In accordance with the above, Plaintiff has made the necessary showing that, absent an injunction, it will suffer irreparable harm as a result of Defendant's actions.  First, on September 29, 2010, five days after Defendant's abrupt resignation from Ayco and his joining UBS in violation of the non-compete provision of the Agreement, the first of at least two former Ayco clients left Ayco and opened accounts with Feldman at UBS.  Roe Aff. ¶¶ 21-22.  One client noted, in an email to an Ayco representative who had reached out to assure that client of a "smooth transition" following Feldman's departure, that "I have up to this point been very pleased with Ayco's service and know it's a professional organization, but I plan to stay with [Feldman] at this time."  Roe Aff., Ex. D (Dkt. No. 4-7).  This email indicates that an existing client with a positive relationship with Ayco that was built, in part, through Ayco's effort and expense, was lost to the company as a result of Feldman's departure and immediate employment with UBS.  The loss of such relationships and client goodwill constitutes irreparable injury.  BDO Seidman, 93 N.Y.2d at 391-93.

Defendant asserts that Ayco's services are not unique and he does not provide any unique services to Ayco, and simultaneously argues that "clients were at Ayco, or stayed at Ayco, in large part because of my efforts to develop and maintain the relationship."   Compare Def.'s Opp'n to Pl.'s PI Mot. (Dkt. No. 19) ("Def.'s Opp'n Mem.") at 16 with Feldman Decl. (Dkt. No. 17) ¶ 33. Where, as here, a financial services employee breaching a non-compete provision is engaged in developing and maintaining client relationships on behalf of his or her employer, and those relationships are cultivated, in part, through the employer's resources, that employee's services are generally deemed "unique."  See Natsource, 151 F. Supp. 2d at 474 ("The uniqueness requirement relates to the employee's relationships").  As such, their loss to a competitor in violation of an agreement results in irreparable harm to the employer.  Id.

So too does the loss of confidential customer information resulting from Defendant's conduct.  North Atlantic Instruments, 188 F.3d at 49.  Plaintiff alleges several instances of Defendant's misuse of proprietary and confidential information.  Feldman admits to possessing a client list, documents relating to revenues generated and commissions earned, and a training manual, see Feldman Decl. (Dkt. No. 17), despite provisions in the Agreement and TSA stating that he would immediately return such property upon his termination.  Feldman contends that some of this material was generated on his home computer, a fact that does not remove its possession from the terms of the Agreement or TSA.  See TSA (including as confidential information, "client lists (whether prepared by you or others at Ayco, and including client information contained within performance reviews or compensation documents), information regarding the identity, assets, financial needs and preferences of clients and prospective clients").  Feldman also asserts that he never looked at or used the materials after his departure from Ayco.  That bald assertion alone cannot support a finding of no irreparable harm.

The above conclusion that Plaintiff satisfies the irreparable injury prong is bolstered by the fact that Defendant expressly agreed that breach of the non-compete clause would leave Plaintiff without an adequate remedy at law and his "agree[ment] that Ayco shall be entitled to temporary, preliminary, and permanent injunctive relief for any violation of" the Goodwill, Confidentiality, Solicitation, or Termination provisions of the Agreement.  Agreement § II.E.2; Ticor, 173 F.3d at 69; Innoviant, 390 F. Supp. 2d at 189.

**B.  Likelihood of Success on the Merits**

Plaintiff's Complaint recites four causes of action: breach of contract; misappropriation of confidential information and trade secrets; breach of fiduciary duties; and unfair competition.

12

Plaintiff's ability to show either a likelihood of success on the merits or sufficiently serious

questions going to the merits to make them a fair ground for litigation and a balance of hardships

tipping decidedly in the movant's favor, on any of these causes of action, if linked to one of the

above bases for a finding of irreparable harm, is sufficient for this Court to grant preliminary

injunctive relief.  Innoviant, 390 F. Supp. 2d at 195-96; Kelly, 626 F. Supp. 2d at 376.

> *1.  Breach of Contract*

Under New York law,[5] an action for breach of contract requires proof of "(1) a contract; (2)

performance of the contract by one party; (3) breach by the other party; and (4) damages."

Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000)(citations omitted); Noise In Attic

Productions, Inc. v. London Records, 10 A.D.3d 303, 307 (1st Dep't 2004).  Defendant does not

deny these elements are met, but he asserts that the Agreement is unenforceable.

Under New York law "a restrictive covenant not to compete is enforceable by way of an

injunction [if] . . . the covenant is reasonable in time and geographic area."  Ticor, 173 F.3d at 69

(citing Reed, Roberts Assocs. v. Strauman, 40 N.Y.2d 303, 307 (1976)).  A restrictive covenant is

enforceable "only if it: (1) is no greater than is required for the protection of the legitimate interest

of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the

public."  BDO Seidman, 93 N.Y.2d at 388-89 (citing Reed, Roberts Assocs., 40 NY2d at 307).

Thus, "courts must weigh the need to protect the employer's legitimate business interests against the

employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public

policy in New York."  Ticor, 173 F.3d at 69; Natsource, 151 F. Supp. 2d at 470-72.

Defendant objects that the ninety-day notice and non-compete provision is not reasonable

---

[5] The Agreement provides that New York law governs.  Agreement § II.E.5.

and hence unenforceable.  Def.'s Opp'n Mem. at 4-6.  The Court disagrees.  A ninety-day period is well within what has been found to be a reasonable time frame for non-compete provisions.  See, e.g., Ticor, 173 F.3d 63 (granting injunction to enforce 180-day non-compete provision); Natsource, 151 F. Supp. 2d 465 (finding reasonable a 30-day notice period with a three-month non-compete provision that requires an employer to continue to pay employee his base salary during that period ends or until he accepts employment with a non-competitor); Chernoff Diamond & Co. v. Fitzmaurice, Inc., 651 N.Y.S.2d 504 (finding reasonable a 60-day notice period with two-year non-compete provision during which a defendant could not solicit, join, provide services to, advise [or] give services to, any person or entity who was a client of plaintiff insurance agency); BDO Seidman, 93 N.Y.2d 382 (eighteen-month restriction reasonable).  The geographic scope of the covenant, i.e., throughout the United States, is also reasonable.  See Lumex, Inc. v. Highsmith, 919 F. Supp. 624 (E.D.N.Y. 1996)(no geographical limitation on one-year restriction on employee's ability to join competitor is reasonable); Business Intelligence Servs., Inc. v. Hudson, 580 F. Supp. 1068 (S.D.N.Y. 1984)(unlimited scope on one-year restrictive covenant is "troublesome" but reasonable given the international scope of the plaintiff's business); GFI Brokers, LLC v. Santana, Case nos. 06 Civ 3988, 06 Civ. 4611, 2008 WL 3166972 (S.D.N.Y. Aug. 6, 2008)("not at all clear that a [four-month] worldwide prohibition would be unreasonable").

        The non-compete and confidentiality provisions of the Agreement are no greater than is required for the protection of Ayco's legitimate interests.  They are aimed at protecting Ayco's confidential trade secrets, which Defendant agreed to use only on behalf of Ayco and with its authorization.  The non-compete provision's requirement that Defendant not engage in financial counseling, brokerage, estate, tax and insurance planning and/or asset management services on

14

behalf of a competitor is broader than the confidentiality provision's requirement that Defendant not use or divulge confidential or proprietary information.  Nevertheless, the former provision is tailored to protect Ayco's legitimate interest in maintaining its client goodwill and its trade secrets, and the ninety-day limitation on that provision prevents the provision from being more restrictive than necessary.  See Lumex, Inc. v. Highsmith, 919 F. Supp. 624 (E.D.N.Y. 1996) at 636 (quoting Monovis, Inc. v. Aquino, 905 F.Supp. 1205, 1234 (W.D.N.Y.1994) for the proposition "even assuming the best of good faith, it is doubtful whether the defendant could completely divorce his knowledge of the trade secrets from any . . . work he might engage in" with a competitor).  Further, the provision only prevents Feldman from providing services comparable to those he provided for Ayco.  Compare with GFI Brokers, 2008 WL 3166972, at 10 (non-competition clause overly broad because it prevents association with a competitor regardless of the nature of that association). Enforcement of the provision does not affect Feldman's relationship with clients he had prior to his joining Ayco, as he had none.  Compare with BDO Seidman, 93 N.Y.2d at 391-92 (more searching analysis required where there is no evidence of misuse of confidential information and non-compete covenant covers "personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which plaintiff neither subsidized nor otherwise financially supported as part of a program of client development").

Finally, the non-compete provision does not impose undue hardship on Defendant.  That provision entitled Defendant to continue to receive his salary or salary draw during the reasonable notice period.  Despite Defendant's estimation that this would inflict a 35-50% pay cut during that ninety-day period, Feldman Decl. (Dkt. No. 17) ¶ 45, the Court finds no "undue hardship" such that this provision is unenforceable.

The Court rejects Defendant's assertion that the terms of the Agreement are unenforceable because they are overly broad and were presented to him "as a 'take it or leave it' proposition," where "leaving it" would mean termination.  Feldman Decl. (Dkt. No. 17) ¶ 41, Def.'s Opp'n Mem. at 13.  The record does not indicate impermissible behavior by Ayco or the existence of duress in executing the Agreement with Defendant.  See Mathias v. Jacobs, 167 F. Supp. 2d 606, 614 (S.D.N.Y. 2001)., Austin Instrument, Inc. v. Loral Corp., 29 N.Y. 2d 124, 130 (1971).  Defendant cites Scott, Stackrow & Co. CPA's, P.C. v. Skavina for the proposition that the restrictive provisions of the Agreement and TSA are unenforceable because they "were imposed in connection with . . . continued employment . . . [under circumstances suggesting] the existence of coercion or a general plan of the employer to forestall competition, and the employer's knowledge that the covenant was overly broad."  780 N.Y.S.2d 675 (3d Dep't 2004).  This argument is unavailing.  Ayco has argued, and the Court agrees, that the provisions at issue serve legitimate business interests, specifically protecting the relationships and goodwill of clients that it achieved through its own efforts and resources, and are not simply propagating anti-competitive conduct.  See, e.g., Reply in Supp. PI Mot. (Dkt. No. 24) at 2-3.  Unlike in Skavina, Plaintiff has not conceded certain provisions are overly broad.  780 N.Y.S.2d 675.  Moreover, Ayco's six-month prohibition on solicitation is significantly less onerous than the two-year prohibition present in Skavina.  Id.  Finally, the fact that these agreements were executed during Feldman's employment and were a condition of his continued employment with Ayco, does not suffice to show are unenforceable.  See Zellner v Stephen D. Conrad, M.D., P.C., 589 N.Y.S.2d 903 (2d Dep't 1992)(non-compete covenant may be supported by an at-will employment relationship, even where no additional consideration

16

was offered and where failure to sign will result in termination).[6]

Defendant's characterization of any enforcement of the non-compete provision as entailing retroactive relief or specific performance of the notice provision is inaccurate.  Dkt. No 19 at 15-17 (citing Credit Suisse Secs. (USA) LLC v. Ebling, No. 06 Civ. 11339, 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006)); Dkt.  No. 12 at 10-13.  There is nothing retroactive in enforcing the terms of a prospective (for ninety-days) provision.  Nor does its enforcement require specific performance of the notice requirement.  Ebling is not to the contrary, as that case did not involve a non-compete provision preventing the defendant from providing the same services to a competitor for a specified period.  2006 WL 3457693, at *1.  The case thus lacked a pertinent fact at issue here.

Contrary to Defendant's claims, see Dkt. No. 12 at 10-11, Plaintiff does not seek, and would not be entitled to specific performance of the notice requirement.  That is, Plaintiff would not be entitled to injunctive relief requiring Defendant to continue working for Ayco during the ninety days at issue.  Similarly, Plaintiff would not be entitled to injunctive relief preventing Defendant from working for a non-competitor, or even for a competitor, if providing services outside the scope of the Agreement during the ninety-day period.

Finally, enforcement of the Agreement is not injurious to the public.  Defendant argues that the non-compete provision is injurious to the public as it prevents individuals from doing business with the broker of their choosing.  Def.'s Opp'n Mem. at 3.  Defendant seeks support for this claim in FINRA Rule 2140 and cases denying injunctions that would result in noncompliance with that Rule as indicative of a "clearly articulated public policy to allow the free transfer of accounts."  Id.

---

[6] The Court makes no finding that the Agreement or TSA did not advance Defendant new rights as consideration for their execution.

17

at 4-6; Dkt. No. 12 at 5-10.  FINRA Rule 2140 provides,

> No member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative . . . .  Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery or acceptance of a written request from a customer to transfer his or her account.

This Rule is inapplicable to Ayco, as Ayco is not a FINRA member.  The limited relationship between Ayco and Mercer, which is a FINRA member, see Cavoli Decl. (Dkt. No. 16-1), does not bind Ayco to comply with FINRA rules.  Cf. Oppenheimer & Co. Inc. v. Deutsche Bank AG, No. 09 Civ. 8154, 2010 WL  743915, at *1 (S.D.N.Y. Mar. 2, 2010)(non-member of FINRA cannot be compelled to arbitrate under FINRA rule).  While Defendant argues that the Rule embodies a generally applicable public policy preference, the force of that preference is mitigated by the facts that Ayco has not sought to bar any customer's request to transfer his or her account and seeks only to enforce an agreed upon non-compete provision that is effective for just ninety days.  In these circumstances, the Court does not believe that public policy so coincides with FINRA rules that Ayco should be held to FINRA standards despite not being a member of that association.

For the foregoing reasons, the Court finds that Plaintiff has met its burden of establishing a likelihood of success on the merits of its breach of contract claim.

### 2. Misappropriation of Trade Secrets

To prevail on a claim  for misappropriation of trade secrets a plaintiff must prove that 1) it possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.  DoubleClick Inc. v. Henderson, No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct.  Nov. 7, 1997)(citing Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990)).  Perhaps in light of the

18

Agreement and TSA's definition of "Trade Secrets" and "Confidential Information" and Defendant's admissions as to materials he possessed and returned only in order to comply with the TRO, Feldman Decl. (Dkt. No. 17), Defendant appears to concede to a preliminary injunction preventing Defendant's use of trade secrets and confidential information.  OSC Tr. 19:16-25-20:1-6.

Whether or not a concession was intended, the Court finds that Plaintiff has shown a substantial likelihood of success on its misappropriation claim.  The materials possessed by Defendant fit squarely within the definition of "Trade Secrets and Confidential Information" found within the TSA.  Plaintiff has asserted, and Defendant has not denied, that Ayco's client list was developed over years and with substantial investments of money and effort, that it is not publicly available, is well-protected, and is valuable, in part, because of its confidentiality. Roe Aff. ¶ 26.

Client lists such as that possessed by Defendant have been upheld as confidential information deserving protection.  See Leo Silfen, Inc., v. Cream, 29 N.Y.2d 387, 392-93 (1972)("where the customers are not known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets.  This is especially so where the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money."); see also Eastern Bus. Sys., Inc. v. Specialty Bus. Solutions, 292 A.D.2d 336, 337-38 (2d Dep't 2002)(client and potential client names, addresses, contact names compiled through considerable effort over several years and not available to the public are trade secrets warranting protection); Giffords Oil Co., Inc. v. Wild, 483 N.Y.S.2d 104, 106 (2d Dep't 1984); FMC Corp., 730 F.2d at 63 (client list deserves protection where it "would be very difficult" to discover the client names even where some of those names could, with effort, be unearthed); Ticor, 173 F.3d at 70 (recognizing an employee's right to injunctive relief to prevent the

19

release of confidential information).  The cases cited by Defendant as evidence that such lists do not

qualify as public information are inapposite, as they involve client lists that were publically

available or easily discoverable.  See Def.'s Opp'n Mem. 22-24.  Similarly, Defendant's reliance

upon the Protocol for Broker Recruiting ("Protocol"), see Feldman Decl. ¶ 27, as a guaranteeing his

right to retain such information is misplaced.  Ayco is not a party to the Protocol, Cavoli Decl. (Dkt.

No. 24-1) ¶4, and is not bound by the terms of that document.

For the above reasons, Plaintiff's showing that Defendant misappropriated confidential

information and trades secrets is sufficient to warrant preliminary injunctive relief.

### 3. Breach of Fiduciary Duties and Unfair Competition

Given the scope of injunctive relief sought, see Dkt. No. 4, and the findings above, the Court

need not consider the merits of Plaintiff's remaining claims at this juncture.

## C.  Balance of Hardships

The Court has found that Plaintiff has shown a likelihood of success on the merits of three of

its claims.  Because the balance of hardships that will ensue from the requested preliminary

injunction tip decidedly in Plaintiff's favor, that injunction would obtain even upon a showing of

"sufficiently serious questions going to the merits to make them a fair ground for litigation."

NXIVM Corp., 364 F.3d at 476.

Absent injunctive relief, Plaintiff is threatened with the imminent, irretrievable disclosure to

competitors of confidential information, developed over years through significant effort and

expense, and with the loss of the goodwill and trust of its client base.  Plaintiff would additionally

lose the benefits of the bargain it negotiated with Defendant.  Conversely, should an injunction lie,

Defendant, in accordance with terms that he agreed to, will not be able to provide for a United

20

States competitor, services comparable to those he provided for and on behalf of Ayco, until

December 23, 2010.  During that period, Defendant will continue to receive his base salary.  After

December 23, 2010, Defendant may provide these services to anyone he chooses, though he may not

divulge Ayco's trade secrets.  The Court finds that the balance of hardships that will ensue from the

grant or withholding of the requested injunction tip decidedly in Plaintiff's favor.

**V.      CONCLUSION**

Based on the foregoing discussion, it is hereby

**ORDERED**, that Plaintiff's Motion for preliminary injunctive relief (Dkt. No. 4) is

**GRANTED**; and it is further

**ORDERED**, that Defendant is preliminarily enjoined from:

(a)  associating as an individual, sole proprietor, officer, employee, partner, director,

consultant, agent or advisor with any business enterprise or person that engages in or

owns or controls a significant interest in any entity that engages in providing financial

counseling, brokerage, estate, tax and insurance planning and/or asset management

services in the United States where, in connection with such association, Defendant is

engaged in providing financial counseling, brokerage, estate, tax and insurance planning

and/or asset management services during a period of not less than ninety (90) days from

September 24, 2010;

(b)  copying or reproducing for Defendant's use or giving, divulging, or revealing or

otherwise disclosing to any person, corporation, partnership or other business or

professional entity, except as authorized to do so by Plaintiff, any form, document,

written material, or computer program, or any method, formula, or plan created,

developed, or utilized by Defendant, as an employee of Plaintiff, or by Plaintiff;

(c)   copying or reproducing for Defendant's use or giving, divulging, revealing, or otherwise

disclosing to any person, corporation, partnership, or other business or professional

entity, except as authorized to do so by Plaintiff, any confidential business information

of Plaintiff or any client of Plaintiff and requiring that Defendant return all copies of

Plaintiff's confidential business information,

(d)  Defendant is hereby directed to return immediately to Plaintiff's attorney all of

Plaintiff's property, including without limitation, confidential business or trade secret

information and all other documents, computer disks or other means of electronic

storage, which contain any of Plaintiff's business information and which are in the

possession, custody, or control of the Defendant; and it is further

**ORDERED**, that Plaintiff shall pay Defendant his base salary through December 23, 2010.

Such payment shall be retroactive from the date of this Court's October 14, 2010 Order (Dkt. No.

8); and it is further

**ORDERED,** that **security in the amount of $ 450,000** shall be posted by Plaintiff prior to

October 25, 2010 at 4:00 p.m. of that day; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.

DATED:   October 22, 2010
         Albany, New York

Lawrence E. Kahn
U.S. District Judge

22